**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SIMON ZHORNITSKY, | ) | CASE NO. 3:24-CV-00018 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| YALE SCHOOL OF MEDICINE and | ) | NOVEMBER 25, 2024 |
| CONNECTICUT MENTAL HEALTH | ) | |
| CENTER, | | |
| *Defendants*. | | |

**MEMORANDUM OF DECISION**
**RE: MOTIONS TO DISMISS [ECF NOS. 10, 22]**

Kari A. Dooley, United States District Judge:

Plaintiff Simon Zhornitsky ("Plaintiff" or "Zhornitsky") brings this employment and education discrimination case against both Yale School of Medicine ("Yale") and the Connecticut Mental Health Center ("CMHC") (collectively, "Defendants"). Plaintiff alleges that Defendants were his joint employers and discriminated against him based on his sex. His claims arise out of Yale's Title IX investigation into his conduct as it pertained to a CMHC employee and the eventual shortening of the term of his employment contract. Both Yale and CMHC filed motions to dismiss, which Plaintiff opposes. For the reasons that follow, CMHC's motion is GRANTED. Yale's motion is GRANTED in part and DENIED in part.

**Standard of Review**

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

**Allegations and Procedural History**

Plaintiff Dr. Simon Zhornitsky is a doctor operating in New Haven, Connecticut, and he is a former Yale employee. Compl., ECF No. 1, ¶ 5. Zhornitsky was hired by Yale in November 2016 to work as an associate research scientist for Dr. Chiang-Shan Ray Li, who was assigned to work at the Connecticut Mental Health Center. *Id.* In February 2017, Zhornitsky began interacting with a CMHC employee named Joanna Perez. *Id.* ¶¶ 7–8. Perez was not a Yale employee, nor is she a party to this case. *Id.* ¶ 8. Between 2017 and 2022, Zhornitsky sent private messages to Perez through Instagram, which Perez did not respond to. *Id.* ¶¶ 10–11. However, Zhornitsky believed that Perez was responding to his messages through her other public posts, and thus, he continued messaging Perez. *Id.* ¶ 12.

In March 2022, Zhornitsky was contacted by CMHC police and Yale's Title IX coordinator, Jason Killheffer, about his messages to Perez. *Id.* ¶ 13. Perez asked that Zhornitsky be notified that she no longer wanted him to send her messages or have any contact with her. *Id.* Zhornitsky immediately and fully complied with the request and never contacted Perez. *Id.* ¶ 14. Two months later, in May 2022, Perez filed another complaint against Zhornitsky, causing Killheffer to open a Title IX investigation. *Id.* ¶¶ 15–16. Killheffer reviewed copies of the

Instagram messages Zhornitsky had sent to Perez, but the investigation did not substantiate any violations and no disciplinary measures were taken. *Id.* ¶¶ 16–17.

The following month, in June 2022, Dr. Gustavo Angarita became Zhornitsky's new supervisor, and he began working on the third floor of the CMHC. *Id.* ¶ 18. However, he continued performing some of his job duties, such as drawing blood, on the second floor. *Id.* ¶ 19. On September 12, 2022, Zhornitsky was performing a blood and urine test on a patient on the second floor, and while he was waiting for the patient to exit the bathroom, Perez walked by Zhornitsky on the way to her office. *Id.* ¶ 20. The two did not interact. *Id.* A week later, on September 19, 2022, Zhornitsky received an email from Killheffer to attend a Zoom meeting with him. *Id.* ¶ 21. At the Zoom meeting, Killheffer told Zhornitsky that Perez had filed another complaint against him for "hanging around the outpatient office," and as a result, CMHC had banned Zhornitsky from the building, pending another investigation. *Id.* Zhornitsky explained that he was only on the second floor to perform his job duties, which his supervisor confirmed; however, Yale said that they nevertheless could not force CMHC to revoke its ban. *Id.* ¶ 22. Eventually, the CMHC removed the ban on Zhornitsky's access to the building, but he remained banned from the CMHC garage and the second floor. *Id.* ¶ 24. On November 22, 2022, Perez sent an email to Killheffer regarding Zhornitsky's return to the CMHC building, in which she indicated that she was still concerned about future incidents, and that she would "like to have this process completed ASAP." *Id.* ¶ 25. Killheffer took no action on this email. *Id.* ¶ 26.

Approximately two months later, Plaintiff filed a charge of discrimination against Yale with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). Yale was notified of the filing of the charge on January 9, 2023. *Id.* ¶ 27. That same day, Diane Cornelius Charles, Yale's deputy Title IX coordinator, initiated a Title IX sexual misconduct complaint

against Zhornitsky on behalf of Perez.  *Id.*  Zhornitsky objected to the complaint, and requested the ability to file his own Title IX complaint against Perez, but Yale advised him that he could not do so "because Perez was not a student, employee or a member of any Yale University program." *Id.* ¶¶ 34, 36.  During the investigation, Yale "did not investigate Perez's [November 2022 email], instead it tore through each and every pre-March 2022, Instagram message that Plaintiff had sent to Perez on her non-affiliated personal business Instagram account and classified those private messages as substantiating a charge of sexual harassment."  *Id.* ¶ 37.  Yale also disregarded the prior three Title IX investigations and complaints and their respective findings.  *Id.* ¶¶ 38, 40.

Yale's Title IX investigation resulted in findings that substantiated a charge of sexual harassment, and as a result, Plaintiff was "suspended, banned from his work location and forced out of his employment with Yale."  *Id.* ¶¶ 37, 41.  Specifically, Zhornitsky's contract was only renewed for a six-month term "instead of the customary one (1) year term."  *Id.* ¶ 64.  Plaintiff was denied interviews within Yale's psychiatry department and could not apply for positions that were located in the CMHC building.  *Id.*

Plaintiff filed the present Complaint on January 4, 2024.  He asserts six causes of action. As against CMHC, he asserts: gender discrimination under Title VII (Count 3); retaliation under Title VII (Count 4); breach of contract (Count 5); a "due process" violation, asserted under Title IX (Count 6); and intentional infliction of emotional distress (Count 7).  As against Yale, he asserts: gender discrimination under Title IX (Count 1); gender discrimination under Title VII (Count 2); retaliation under Title VII (Count 4); breach of contract (Count 5); a Title IX due process violation (Count 6), and intentional infliction of emotional distress (Count 7).  CMHC and Yale separately move to dismiss all claims against them.

**Discussion**

I.    CMHC's Motion to Dismiss

        a.    Counts 5 and 7: Breach of Contract and Intentional Infliction of Emotional Distress
                (IIED)

Plaintiff asserts common-law breach of contract and IIED claims against the CMHC.

CMHC argues that these claims are barred by the Eleventh Amendment, and the sovereign

immunity afforded thereunder, insofar as CMHC is an "arm of the state."  The Court agrees.  The

Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be

construed to extend to any suit in law or equity, commenced or prosecuted against one of the

United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S.

Const. amend. XI.  "The Eleventh Amendment has been interpreted as also barring suits in federal

court against a state brought by that state's own citizens."  *Mary Jo C. v. N.Y. State & Loc. Ret.

Sys.*, 707 F.3d 144, 151 (2d Cir. 2013).  This immunity extends not only to the State itself but "to

state agents and state instrumentalities that are, effectively, arms of a state."  *Woods v. Rondout

Valley Centr. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (quotation marks omitted).

Eleventh Amendment immunity from suit "applies regardless of the nature of the relief sought,"

except in circumstances "where the state has consented to be sued or Congress has abrogated the

states' Eleventh Amendment immunity."  *Lee v. Dep't of Child. & Fams.*, 939 F. Supp. 2d 160,

165 (D. Conn. 2013) (quotations omitted).

The Second Circuit has identified two sets of overlapping factors to consider when

determining whether an entity is an "arm of the state" that is entitled to Eleventh Amendment

immunity.  *See Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 293 (2d Cir. 1996); *Clissuras

v. City Univ. of N.Y.*, 359 F.3d 79, 82 (2d Cir. 2004) (per curiam).  The *Mancuso* factors require a

court to consider: "(1) how the entity is referred to in the documents that created it; (2) how the

governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 135 (2d Cir. 2015) (quoting *Mancuso*, 86 F.3d at 293). If these factors point in different directions, the court must focus primarily on the "two main aims of the Eleventh Amendment," that is, "preserving the state's treasury and protecting the integrity of the state." *Id.* The second test, known as the *Clissuras* test, focuses on just two factors: "(1) the extent to which the state would be responsible for satisfying any judgment that might be entered against the defendant entity, and (2) the degree of supervision exercised by the state over the defendant entity." *Id.* (quoting *Clissuras*, 359 F.3d at 82). The Second Circuit has instructed district courts to consider both of these tests in tandem. *See id.* at 137.

The CMHC is a subdivision of the Department of Mental Health and Addiction Services (DMHAS), established by statute and operated by DMHAS in conjunction with Yale. Conn. Gen. Stat. § 17a-459; *see also id.* § 17a-450(b). The CMHC is classified as a "[s]tate-operated facilit[y]" by statute, *id.* § 17a-458(c),[1] and its activities are extensively regulated by the commissioner of DMHAS. *See id.* § 17a-451(c); *id.* § 17a-460e ("[CMHC] may do the following, *if approved by the commissioner* [*of DMHAS*] . . . . (emphasis added)); *id.* § 17a-473 ("*Subject to the standards established by the Commissioner of* [*DMHAS*] . . . each superintendent or director . . . shall be in charge of its day-to-day operations." (emphasis added)). For instance, the DMHAS commissioner controls whether CMHC participates in provider networks, *id.* § 17a-460b; whether it may enter into provider or other contractual agreements with health insurance

---

[1] "State-operated facilities" are defined as "hospitals or other facilities providing treatment for persons with psychiatric disabilities or for persons with substance use disorders, or both, which are operated in whole or in part by [DMHAS]." Conn. Gen. Stat. § 17a-458(c).

plans, *id.* § 17a-460c(a); how and whether CMHC employs attorneys, accountants, and other experts; how it owns or manages property; and whether it accepts loans, gifts, or grants, *id.* § 17a-460e. Further, CMHC's director is appointed and subject to removal at the sole discretion of the DMHAS commissioner. *Id.* § 17a-472.

Multiple courts in this district have concluded that DMHAS is an arm of the state for Eleventh Amendment purposes. *See, e.g.*, *Volpe v. Conn. Dep't of Mental Health*, 88 F. Supp. 3d 67, 76 (D. Conn. 2015); *Owoeye v. Connecticut*, No. 3:14-CV-664, 2016 WL 1089179, at *4 (D. Conn. Mar. 18, 2016); *Pinder v. Conn. Dep't of Mental Health & Addiction Servs.*, No. 3:20-CV-1918, 2022 WL 475162, at *3–4 (D. Conn. Feb. 16, 2022). Plaintiff does not argue otherwise. And multiple courts have also concluded that "state-operated facilities" under DMHAS that are similar to CMHC[2]—with almost identical sources of authority and leadership structures[3]—are protected by the Eleventh Amendment. *See, e.g.*, *Belles v. Fernwood Manor*, No. 3:23-CV-112, 2023 WL 3022393, at *2 (D. Conn. Apr. 20, 2023) (finding that the Capitol Region Mental Health Center is entitled to Eleventh Amendment immunity); *Zigmund v. Solnit*, 165 F.3d 16, 1998 WL 769747, at *1 (2d Cir. 1998) (affirming district court decision that dismissed claims against Connecticut Valley Hospital (CVH) on basis of sovereign immunity); *Salters v. Hyatt*, No. 3:22-CV-255, 2022 WL 21756773, at *2–3 (D. Conn. Mar. 17, 2022) (recommending dismissal of

---

[2] The applicable statute classifies seven entities as state-operated facilities, operating under DMHAS: the Capitol Region Mental Health Center, the Connecticut Valley Hospital, the Whiting Forensic Hospital, the Franklin S. Dubois Center, the Greater Bridgeport Community Mental Health Center, River Valley Services, and the CMHC. Conn. Gen. Stat. § 17a-458(c).

[3] All state-operated facilities under section 17a-458(c) are regulated by the commissioner of DMHAS. Conn. Gen. Stat. § 17a-451(c). All facilities are also regulated by section 17a-470, under which the superintendent or director of each organization must appoint an advisory board, of which two members must have lived experience with a behavioral health disorder. *Id.* § 17a-470 (effective Oct. 1, 2023). Indeed, the structures of all state-operated facility advisory boards are identical. *Id.* All facilities' records are subject to investigation and examination by DMHAS. *Id.* §§ 17a-451(f)(1), 17a-457(e). And the commissioner of DMHAS is charged with developing and implementing a uniform psychiatric treatment plan for all state-operated facilities. *Id.* § 17a-451(j).

claims against CVH officials because of Eleventh Amendment), *R. R. adopted*, Order, No. 3:22-CV-255, ECF No. 7 (Apr. 19, 2022).

Here, the degree of control and supervision that DMHAS exerts over CMHC, as laid out by its statutory framework, weighs heavily in favor of sovereign immunity. Furthermore, CMHC operates statewide, *see* Conn. Gen. Stat. § 17a-460b; *id.* § 17a-465 (designating police officers who monitor the grounds of CMHC facilities as "state policemen"), and CMHC's finances are controlled and approved by the DMHAS commissioner, a state official. *See id.* §§ 17a-460f, 17a-460c(d). Plaintiff argues in opposition that this is not a decision that can be made on a motion to dismiss and cites to cases from the Tenth Circuit stating the same, *see* Opp'n to CMHC's Mot. to Dismiss, ECF No. 30, at 3–4. But the Second Circuit has repeatedly affirmed district court decisions asserting sovereign immunity at the motion to dismiss stage. *E.g.*, *Leitner*, 779 F.3d at 132; *T.W. v. N.Y. State Bd. of L. Exam'rs*, 996 F.3d 87, 89 (2d Cir. 2021); *Allco Fin. Ltd. v. Roisman*, No. 22-2726, 2023 WL 4571965, at *1–2 (2d Cir. July 18, 2023). The Court may therefore rule on this issue at this stage and on this record; CMHC is protected by Eleventh Amendment immunity with respect to the claims asserted in Counts Five and Seven.

b. <u>Counts 3 and 4: Gender Bias, Discrimination, and Retaliation Under Title VII</u>

Plaintiff asserts discrimination and retaliation claims under Title VII against CMHC. CMHC seeks dismissal of these counts because it was not Plaintiff's employer. Plaintiff asserts that CMHC qualified as his employer under two theories: (1) that CMHC was held out as an "agent" or "affiliate" of Yale, and thus, qualifies as his employer under Title VII, and (2) that CMHC constituted a "joint employer" with Yale. *See* Opp'n to CMHC's Mot. to Dismiss, ECF No. 30, at 5–6.

Title VII provides that it is an "unlawful employment practice for an employer to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a). "[T]he existence of an employer-employee relationship is a primary element of Title VII claims." *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 838 (2d Cir. 2022) (quotation omitted) ("The plausible existence of a requisite employer-employee relationship is thus a cornerstone of an adequately pled Title VII complaint.").

"The joint employer doctrine, along with the 'single employer' (or 'single integrated employer') doctrines have been developed to allow a plaintiff to assert employer liability in the employment discrimination context against entities that are not h[is] formal, direct employer." *Griffin v. Sirva Inc.*, 835 F.3d 283, 292 (2d Cir. 2016) (quotation omitted). "Most commonly, the joint employer doctrine applies where the plaintiff's employment is subcontracted by one employer to another, formally distinct, entity." *Felder*, 27 F.4th at 838 (quotation omitted). In determining whether an entity constitutes a joint employer, courts in this Circuit are directed to consider a list of non-exhaustive factors drawn from the common law of agency, including "control over an employee's hiring, firing, training, promotion, discipline, supervision, handling of records, insurance, and payroll." *Id.* Accordingly, whether CMHC is a joint employer or an agent of Yale is a distinction without a difference. The analysis is the same. The Court is required to consider the agency factors regardless.

Plaintiff does not dispute that he was hired by Yale, nor that Yale was ultimately the entity that decided not to renew his contract. Compl., ECF No. 1, ¶¶ 5, 64. The Complaint details that Yale (or other Yale employees) controlled Plaintiff's work location, *id.* ¶¶ 5, 18, 22; that Yale handled the initial and subsequent investigations into Plaintiff's conduct with Perez, *id.* ¶ 16

("Yale's Title IX Coordinator and its Director of Psychiatry, John Krystal began an investigation."); *id.* ¶¶ 21–22, 25–27; and that Plaintiff was supervised by other Yale employees, *id.* ¶¶ 5, 18, 22. The Complaint contains no allegations that CMHC or CMHC employees took part in any of these activities. Nor are there any allegations that Plaintiff ever received a salary or financial remuneration for his work from CMHC. Notwithstanding, Plaintiff argues that his use of certain CMHC facilities (albeit while working for and being paid by Yale)—such as the CMHC office location, blood draw station, and parking lot—shows that he received "indirect financial benefits" from CMHC. Opp'n to CMHC's Mot. to Dismiss, ECF No. 30, at 5–6. This argument is specious. Plaintiff's access to and use of CMHC facilities by virtue of the relationship between Yale and CMHC cannot reasonably be characterized as remuneration from CMHC at all, let alone remuneration that is sufficiently "significant" or "substantial," as the law requires. *See York v. Ass'n of the Bar*, 286 F.3d 122, 126 (2d Cir. 2002) (holding that benefits such as "salary or other wages; employee benefits, such as health insurance; vacation; sick pay; or the promise of any of the foregoing" can constitute renumeration under Title VII, but that clerical support and networking opportunities, as "merely incidental" benefits, cannot).

Further, Plaintiff's reliance on CMHC's ban of Plaintiff from its facility to establish the requisite control over Plaintiff is misplaced. As Plaintiff acknowledges, CMHC had total control over its own facility because "Yale could not force CMHC to let [Plaintiff] back into the building." Compl., ECF No. 1, ¶ 22. CMHC could not be considered an "agent" of Yale if it had the autonomy to ban Yale employees from its facility against Yale's wishes. *Cf.* Restatement (Second) of Agency § 220(1) (Am. L. Inst. 2010) ("A servant is a person employed to perform services in the affairs of another and . . . is *subject to the other's control or right to control*." (emphasis

added)).  As Plaintiff has not plausibly alleged an employer-employee relationship with CMHC, Counts Three and Four are dismissed.

c.  Count 6: Violation of Due Process Under Title IX

As against CMHC, Plaintiff also asserts a due process violation under Title IX, claiming that CMHC violated his due process rights by "assisting Yale in prosecuting the plaintiff for unfounded harassment claims."  Opp'n to CMHC's Mot. to Dismiss, ECF No. 30, at 12; *see* Compl., ECF No. 1, ¶¶ 114–21.  Plaintiff and CMHC disagree as to how exactly this claim is framed; however, regardless of the theory, any Title IX claim against CMHC must be dismissed because CMHC is not an educational institution or program that receives federal funding, as is required to bring a claim under Title IX.

Title IX prohibits sex discrimination in "any educational program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Federal courts have applied a variety of factors to determine whether an entity is engaged in an educational program or activity: "[T]he structure of the program, including the involvement of instructors and inclusion of examinations or formal evaluations; whether tuition is required; the benefits conferred through the program, such as degrees, diplomas, or other certifications; the 'primary purpose' of the program; and whether regulators accrediting the institution 'hold it out as educational in nature.'"  *Castro v. Yale Univ.*, 518 F. Supp. 3d 593, 603 (D. Conn. 2021) (first quoting *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 556 (3d Cir. 2017); and then citing *O'Connor v. Davis*, 126 F.3d 112, 118–19 (2d Cir. 1997)).  The Supreme Court has directed courts to "afford Title IX a broad scope" in its coverage of what constitutes an educational program or activity.  *See id.*

There is no dispute that Yale is an educational institution that is subject to Title IX.  Plaintiff's argument that CMHC is also subject to Title IX is premised on its alleged involvement

in the Title IX proceedings that Yale initiated, and the fact that the alleged events underlying those proceedings occurred on CMHC property. Opp'n to CMHC's Mot. to Dismiss, ECF No. 30, at 12–13; *see* Compl., ECF No. 1, ¶¶ 117–21. The Complaint does not allege that CMHC's mission is educational or that CMHC has any connection to Yale's educational operations. *See, e.g.*, *Rule v. Braiman*, No. 23-CV-1218, 2024 WL 4042135, at *9 (N.D.N.Y. Sept. 4, 2024) ("The Amended Complaint is devoid of allegations that the Glens Falls Hospital has any educational 'features,' or that Glens Falls Hospital has any connection to the educational component of Albany Med beyond being owned by Albany Med." (citation omitted)). Nor does the Complaint allege that CMHC performed any educational activities: accepted tuition, hired teachers, or conferred any sort of certification on people. *See O'Connor*, 126 F.3d at 118 ("Rockland plainly does not satisfy this definition, as its 'primary purpose' is in no sense to educate: it accepts no tuition, has no teachers, has no evaluation process, and requires no regular hours or course of study for its volunteer workers."). CMHC's alleged, tangential involvement in one of Yale's Title IX investigations does not impute Title IX liability to CMHC. *See, e.g.*, *Delgado v. Puerto Rican Fam. Inst., Inc.*, No. 97-CV-7122, 2001 WL 964000 *4 n.5 (S.D.N.Y. Aug. 23, 2001) (Batts, J.) (dismissing Title IX claim against social worker nonprofit because its mission was not educational); *cf. Romero v. City of New York*, 839 F. Supp. 2d 588, 614 (E.D.N.Y. 2012) ("Simply because the City receives federal funding and operates educational programs or activities does not mandate a finding that all of its various departments, like the DOI, and the subdivisions of those departments, like SCI, are subject to Title IX.").

To the extent Plaintiff argues that CMHC should be subject to Title IX as an accessory to Yale's Title IX liability, Opp'n to CMHC's Mot. to Dismiss, ECF No. 30, at 12, he is wrong. Title IX does not provide for vicarious, or imputed, liability. *See Davis ex rel. LaShonda D. v. Monroe*

*Cnty. Sch. Bd. of Educ.*, 526 U.S. 629, 642 (1999) (rejecting the use of agency principles to impute liability on school districts for employee misconduct under Title IX); *cf. Ellis v. Univ. of Rochester*, No. 19-CV-6380, 2024 WL 493504, at *26 (W.D.N.Y. Feb. 8, 2024) ("[A] university may be held liable for money damages under . . . Title IX only where the university itself has discriminated against a plaintiff through an official action or policy, or where the university has actual notice of discrimination by a third party under its control and responds with deliberate indifference."). Nor does Title IX confer aiding and abetting liability on non-educational entities. *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 470 (1999) (holding that a private, non-educational organization is not subject to Title IX, even though it receives payments from entities that are subject to Title IX); *Miotto v. Yonkers Pub. Schs.*, 534 F. Supp. 2d 422, 427 (S.D.N.Y. 2008) ("[A school district] may be liable under Title IX only for its own misconduct because the government's enforcement power may be exercised only against the funding recipient, and the [Supreme] Court has not extended damages liability under Title IX to parties outside the scope of that power." (citing *Davis*, 526 U.S. at 641)). Plaintiff cites no authority to the contrary. In the absence of a threshold showing that CMHC administers an educational program or activity, *see Rule*, 2024 WL 4042135, at *9, Count Six, Plaintiff's Title IX claim against CMHC, is dismissed.

Accordingly, CMHC's Motion to Dismiss is GRANTED.

II.    <u>Yale's Motion to Dismiss</u>

Although Plaintiff asserted breach of contract and IIED claims against Yale in the Complaint, *see* Compl., ECF No. 1 (Counts 5 and 7), in his memorandum of law in opposition to the motion, Plaintiff withdrew those claims against Yale, and indeed, failed to brief them in his opposition. Opp'n to Yale's Mot. to Dismiss, ECF No. 20, at 2 n.2; *see* Yale's Reply in Supp. of Mot. to Dismiss, ECF No. 21, at 8–9. The Court therefore finds these claims abandoned. *See,*

*e.g.*, *Lami v. Stahl*, No. 3:05-CV-1416, 2007 WL 3124834, at *1 (D. Conn. Oct. 25, 2007) ("It is well settled that a failure to brief an issue is grounds to deem the claim abandoned."). Counts 5 and 7 are Dismissed.

　　　a. <u>Counts 1, 2, and 6: Gender Discrimination Claims Under Title VII and Title IX, and Violation of Due Process Under Title IX</u>

Plaintiff asserts claims of gender discrimination against Yale under both Title VII (Count 2) and Title IX (Count 1). Compl., ECF No. 1. He also asserts a violation of his due process rights on grounds of "double jeopardy" resulting from Yale's Title IX investigation (Count 6). *Id.* ¶¶ 113–24. To the extent Plaintiff purports to allege violations of the Double Jeopardy Clause of the Fifth Amendment, he cites to no authority for such a claim under Title IX; and in any event, Yale is not a state actor who could be held liable for constitutional violations under 42 U.S.C. § 1983. *See Lindke v. Freed*, 144 S. Ct. 756, 764 (2024); *see, e.g.*, *McArthur v. Yale New Haven Hosp.*, No. 3:20-CV-998, 2021 WL 3725996, at *5 (D. Conn. Aug. 23, 2021) ("[C]ourts in this District routinely dismiss section 1983 claims against YNHH (or one of its employees) because the plaintiff failed to plausibly allege that YNHH was a state actor or was acting under color of state law.") (collecting cases). And indeed, Plaintiff concedes that Count 6 may be duplicative of Count 1, in which he alleges straightforward gender discrimination under Title IX against Yale. Count Six is dismissed.

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge . . . or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . [sex].'" 42 U.S.C. § 2000e-2(a)(1). Discrimination claims under Title VII are analyzed using the *McDonnell Douglas* burden-shifting framework. *See McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006). Under the *McDonnell Douglas* test, plaintiff

"bears the minimal burden of setting out a *prima facie* discrimination case," *id.*, in which a plaintiff must show (1) that he is a member of a protected class; (2) that he was otherwise qualified for the position; (3) that he suffered an adverse employment action; and (4) that the action arose under circumstances giving rise to an inference of discriminatory intent. *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). At the pleading stage, the Second Circuit has noted that this is an "exceedingly low burden" for plaintiffs to meet. *Dawson v. N.Y.C. Transit Auth.*, 624 F. App'x 763, 770 (2d Cir. 2015); *see Doe v. Columbia Univ.*, 831 F.3d 46, 55 n.8 (2d Cir. 2016) (collecting cases vacating stringent Rule 12(b)(6) dismissals of discrimination complaints).

Courts have frequently analyzed Title IX claims through the same lens and interpretive framework as Title VII claims. *See Columbia Univ.*, 831 F.3d at 55. Title IX provides, in relevant part, "No person in the United States shall, on the basis of sex, be excluded from participation in, or be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" *Columbia Univ.*, 831 F.3d at 53 (alteration in original) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). In the context of a university disciplinary proceeding, to satisfy the fourth prong of the plaintiff's *prima facie* case, the Second Circuit has held that "where a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a *prima facie* case of sex discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019).

Here, the Complaint contains sufficient factual allegations to give rise to an inference of discriminatory intent on Yale's part, and thus, Plaintiff's Title VII and Title IX claims against Yale survive.[4]  The Complaint details how, prior to the initiation of Title IX proceedings against Plaintiff in January 2023, Yale initiated three investigations into Plaintiff's conduct towards Perez: (1) in March 2022, following Perez's request that Plaintiff no longer contact her, a request with which Plaintiff complied, Compl., ECF No. 1, ¶¶ 13–15; (2) in May 2022, after Perez filed another complaint, which did not result in any disciplinary actions, *id.* ¶ 17; and (3) in September 2022, after Perez filed a third complaint about Plaintiff "hanging around the outpatient office." *Id.* ¶ 21. As to this last investigation, after Yale investigated Plaintiff's statement that he was only there to fulfill his job duties, no wrongdoing was found, *id.* ¶¶ 21–22.  When Yale initiated the Title IX sexual misconduct complaint in January 2023, again on behalf of Perez, Plaintiff alleges that the committee disregarded the findings of these prior investigations, and further, gave more weight to Perez's allegations than to Plaintiff's response.  *Id.* ¶¶ 37–40.  Indeed, the Complaint posits that a Title IX proceeding could not have been properly brought against Plaintiff because all prior complaints against him had been found either to be unsubstantiated or not rising to the level of sexual harassment or stalking.  *Id.* ¶ 29.  Plaintiff further alleges that he was denied the opportunity to file his own Title IX complaint against Perez because she was not affiliated with Yale, even though Yale initiated its own complaint against Plaintiff on Perez's behalf.  *Id.* ¶¶ 34–35.[5]  The

---

[4] For purposes of this motion to dismiss, Yale does not dispute that Plaintiff has established the first three prongs of a *prima facie* claim for sex discrimination (that Plaintiff asserts discrimination based on a protected characteristic, that he was otherwise qualified for his position, and that he suffered an adverse action by Yale).  Yale's Mot. to Dismiss, ECF No. 10-1, at 14.

[5] Neither party addresses in their briefing the issue of whether a university *can* initiate a Title IX complaint against one of its employees on behalf of a complainant who is *not* affiliated with the university, either as a student, instructor, or employee.  The Complaint, however, points to this as another point in favor of his argument that Yale was biased against Plaintiff because of his sex.  *See* Compl., ECF No. 1, ¶ 35 ("Yale implemented a sex-based disparate, discriminatory and differential standard on behalf of a non-Yale-affiliated female individual subjecting the Plaintiff to sex/gender discrimination, harassment and retaliation."); *see also id.* ¶¶ 46–56.  The Court does not reach

16

alleged procedural irregularities by Yale, *see id.* ¶¶ 46–56, and the non-neutral weighing of evidence, is similar to the allegations in other cases that the Second Circuit has found passes Rule 12(b)(6) muster. *See, e.g.*, *Columbia Univ.*, 831 F.3d at 56–57 (reversing district court's grant of motion to dismiss where, *inter alia*, complaint alleged university's failure to investigate witnesses favorable to plaintiff); *Vengalattore*, 36 F.4th at 107 (same); *Menaker*, 935 F.3d at 34 (noting that "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side," an inference of sex discrimination is appropriate (quoting *Columbia Univ.*, 831 F.3d at 57)).

Yale's argument, seeking to avoid this conclusion or the application of this case law, is overly narrow, focusing only upon two theories of sex discrimination in university disciplinary proceedings: selective enforcement or erroneous outcome. Generally, Title IX claims that challenge a university disciplinary proceeding on sex discrimination grounds proceed on an "erroneous outcome" or "selective enforcement" theory, or both. *See Roe v. St. John's Univ.*, 91 F.4th 643, 652 (2d Cir. 2024) (discussing *Yusuf*). But the Circuit has reiterated that such a claim need not fall neatly into one of these categories, *id.* at 652 n.9, and regardless, the burden that plaintiff must meet remains the same: he must show circumstances giving rise to an inference of discrimination.[6] Furthermore, many of the cases Yale cites in support of its motion are ones

---

this legal issue here, but in the context of the Complaint, this discrepancy is properly viewed as another factual allegation of a procedural irregularity, leading to an inference of sex discrimination. *See Menaker*, 935 F.3d at 33–35 (holding that procedural irregularities in university Title IX investigations can "provide the requisite support for a *prima facie* case of sex discrimination"); *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 107–08 (2d Cir. 2022) (pointing to the allegation that a university's Title IX investigation lacked a jurisdictional basis as a procedural irregularity weighing in favor of an inference of sex discrimination).

[6] Yale also argues that Plaintiff cannot make out a *prima facie* sex discrimination claim because he failed to identify a similarly situated employee. But it is not required for a Title VII or Title IX plaintiff to identify a comparator. It is one of many ways of making out a *prima facie* discrimination claim—sufficient, but not necessary. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). Because Plaintiff has successfully fulfilled the fourth prong by pointing to other factual allegations, he does not need to identify a similarly situated employee.

17

decided at summary judgment.  *E.g.*, *Ali-Hasan v. St. Peter's Health Partners Med. Assocs., P.C.*, No. 22-2669, 2023 WL 7320860, at *1 (2d Cir. Nov. 7, 2023);[7] *Simons v. Yale Univ.*, 712 F. Supp. 3d 267, 272 (D. Conn. 2024); *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 452 (S.D.N.Y. 2015).  Others, such as *Yusuf*, were decided pre-*Columbia University*, and thus, do not apply the Circuit's more recent holdings on this issue.  *See Roe*, 91 F.4th at 665–66 (Menashi, J., dissenting) (discussing criticisms of the *Yusuf* framework in light of *Columbia University*).  Yale's argument is therefore unpersuasive.  Plaintiff has successfully met the minimal burden of alleging circumstances that give rise to an inference of discrimination, sufficient to survive a motion to dismiss for both his Title IX and Title VII claims.  *See Menaker*, 935 F.3d at 32 (noting that the holding of *Columbia University* and its progeny are "not limited to Title IX claims rather than Title VII claims" because courts "apply similar principles in both Title VII and Title IX when seeking to identify discriminatory intent").

---

[7] Yale relies heavily on *Ali-Hassan* in its reply brief.  Yale's Reply in Supp. of Mot. to Dismiss, ECF No. 21, at 6–8.  The *Ali-Hassan* court affirmed the holding of the district court and granted judgment in favor of the defendant employers on plaintiff's Title VII sex discrimination claim.  2023 WL 7320860, at *1.  Plaintiff Ali-Hassan, who was terminated by the defendants after they received an anonymous complaint against him for sex discrimination, sued defendants for sex discrimination himself, arguing under *Menaker* that they failed to adequately investigate the complaint.  *Id.*  The Second Circuit found that plaintiff failed to satisfy the *Menaker* test because he did not prove the fourth prong: that the defendants "were under 'criticism for reacting inadequately to allegations of sexual misconduct by members of one sex.'"  *Id.* at *2 (quoting *Menaker*, 935 F.3d at 33).

However, Yale's reliance on *Ali-Hassan* is misplaced: first, as discussed above, that case was decided at summary judgment, after an extensive record had been developed.  *Id.* at *1, *3.  Plaintiff's burden to establish a *prima facie* case at the motion to dismiss stage is significantly lower.  *See Dawson*, 624 F. App'x at 770 ("[T]he evidentiary burden that a plaintiff must satisfy in order to survive an employer's *summary judgment* motion, made prior to the showing of a legitimate justification for the adverse employment action, is 'minimal and *de minimis*.'  At the pleading stage, district courts would do well to remember this exceedingly low burden that discrimination plaintiffs face even *after* they have survived a motion to dismiss." (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005))).  Second, the *Ali-Hassan* court relied upon other flaws in plaintiff's case in affirming the district court, including the fact that he did not show that he was otherwise qualified for his position, nor did he present *any* other evidence that could reasonably lead to an inference of intentional sex discrimination.  2023 WL 7320860, at *2–3.

b. <u>Count 4: Retaliation Claim Under Title VII</u>

Lastly, Yale moves to dismiss Plaintiff's retaliation claim under Title VII.  Title VII makes it unlawful "for an employer to discriminate against any of [their] employees . . . because [they have] opposed any practice made unlawful by this subchapter, or because [they have] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Retaliation claims under Title VII are also analyzed using the *McDonnell Douglas* burden-shifting framework.  *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).  To establish a *prima facie* case of retaliation, a plaintiff must show: (1) participation in a protected activity; (2) defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  *Id.*

An adverse employment action in a retaliation claim is viewed more broadly than an adverse employment action in a discrimination claim.  For retaliation purposes, the standard is "whether the action taken by the employer is 'materially adverse,' meaning 'harmful to the point that [the action] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *John v. Walmart Store No. 2585*, No. 3:21-CV-1285, 2023 WL 2346577, at *8 (D. Conn. Mar. 3, 2023) (quoting *Hicks*, 593 F.3d at 165); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (same).  Although the standard for assessing whether an action is materially adverse is objective, "context matters."  *Hicks*, 593 F.3d at 165 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006)).  A materially adverse action "is not limited to discriminatory actions that affect the [plaintiff's] terms and conditions of employment" in the strict sense, such as a plaintiff's pay or job responsibilities.  *White*, 548 U.S. at 64.  Rather, "[a]n employer can effectively retaliate against an employee by taking actions not

19

directly related to his employment or by causing him harm outside the workplace." *Id.* at 63 (emphasis omitted).

With respect to causation, "a plaintiff must plausibly plead a connection between the [adverse] act and his engagement in protected activity." 42 U.S.C. § 2000e-3(a). For retaliation claims, "the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega*, 801 F.2d at 90. Temporal proximity between a protected activity and an adverse employment action can establish a *prima facie* case of retaliation. *See, e.g.*, *Pistello v. Bd. of Educ.*, 808 F. App'x 19, 22–23 (2d Cir. 2020); *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932 (2d Cir. 2010), *overturned in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

Plaintiff alleges that Yale retaliated against him for filing a complaint with the CHRO by opening the January 2023 Title IX investigation. Compl., ECF No. 1, ¶ 96. Plaintiff alleges that when Yale learned of the CHRO complaint, on the same day (January 9, 2023), Yale opened a Title IX sexual misconduct complaint against Plaintiff on Perez's behalf, despite the three earlier investigations which had revealed no misconduct. *Id.* ¶¶ 13–22, 27, 90–92. There is no question that filing a discrimination complaint with the CHRO is protected activity under Title VII. *See, e.g.*, *Vega*, 801 F.3d at 91 (holding that retaliatory actions after plaintiff filed charge of discrimination with EEOC can sustain a Title VII retaliation claim). However, Yale argues that (1) the Complaint fails to assert that Plaintiff suffered an adverse employment action, and (2) the allegations do not establish a causal link between Plaintiff's CHRO complaint and Yale's Title IX investigation. Yale's Mot. to Dismiss, ECF No. 10-1, at 15–17.

Yale first argues that the down-the-line effects that Plaintiff allegedly suffered as a result of the Title IX investigation—including being unable to apply for career development awards,

having a shortened employment contract, and being denied interviews—are too remote and/or vague to sustain a retaliation claim. *Id.* at 15. The Court disagrees. Yale ignores the main thrust of the retaliation claim: that the Title IX investigation *itself*, and its direct consequences, was the adverse employment action taken in response to his CHRO complaint. Compl., ECF No. 1, ¶¶ 33, 41, 91, 96. "[C]ase law now establishes with reasonable clarity that an investigation which results in workplace discipline may qualify as an adverse employment action." *Bain v. Wrend*, No. 15-CV-202, 2020 WL 1316660, at *7–8 (D. Vt. Mar. 20, 2020) (collecting cases). The Complaint alleges that after the Title IX investigation, Yale "issued findings" against Plaintiff, which resulted in him "being suspended, banned from his work location and forced out of his employment with Yale." Compl., ECF No. 1, ¶ 41. At this stage, these allegations—that Yale opened a Title IX investigation into Plaintiff which resulted in disciplinary consequences—are sufficient to allege that Plaintiff suffered an adverse employment action.

Yale next argues that the allegations fail to demonstrate a causal link between the protected activity (the CHRO complaint) and the adverse employment action (the Title IX investigation) because Perez contacted Yale about opening a Title IX investigation two months before the CHRO complaint was filed. Yale's Mot. to Dismiss, ECF No. 10-1, at 16. However, the timing of Perez's conduct is irrelevant: the causal link that Plaintiff must establish is between the protected activity and *Yale's* alleged actions, not Perez's. When Yale received Perez's inquiry on November 22, 2022, it could have chosen to open an investigation at any time; but the Complaint alleges that Yale's Title IX coordinator took no action on the inquiry for two months. Compl., ECF No. 1, ¶¶ 25–26. Drawing all reasonable inferences in favor of Plaintiff, the Complaint alleges that Yale only chose to open the investigation on January 9, 2023, the day that it was notified that Plaintiff had filed the CHRO complaint. *Id.* ¶ 27. And this temporal proximity between the protected

activity and adverse action of less than one day is close enough in time to permit an inference of causation.  *See, e.g.*, *Luzunaris v. Baly Cleaning Servs.*, No. 23-CV-11137, 2024 WL 3926708, at *22 (S.D.N.Y. July 29, 2024) (finding causal link between termination that occurred on same day as protected activity), *R. & R. adopted*, 2024 WL 3925919 (Aug. 22, 2024).  Yale's motion to dismiss Plaintiff's Title VII retaliation claim is therefore denied.

**Conclusion**

As explained above, Defendant CMHC's motion to dismiss is GRANTED in its entirety. The Clerk of the Court is directed to terminate CMHC.  Defendant Yale's motion to dismiss is GRANTED as to Counts 5, 6 and 7, but DENIED as to Counts 1, 2, and 4.

**SO ORDERED** at Bridgeport, Connecticut, this 25th day of November, 2024.

  */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE